**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| CHRISTINA LYNN REISE, individually and on behalf of all other similarly situated persons, | ) ) ) |
| ALAN MILLER, individually and on behalf of all other similarly situated persons, | ) ) ) |
| SHARON JONES, individually and on behalf of all other similarly situated persons, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No.: 4:23-cv-1335 ) |
| CITY OF CALVERTON PARK, MISSOURI, | ) ) ) |
| SEAN GIBBONS, in his individual capacity, | ) **JURY TRIAL DEMANDED** ) |
| Defendants. | ) |

**CLASS ACTION COMPLAINT**

1.      Plaintiffs and Class Members in this case are individuals whose cars were towed from private property at the direction of the City of Calverton Park for alleged violations of the municipal nuisance ordinances. Calverton Park violated the United States Constitution by failing to provide residents with notice or an adequate opportunity to be heard either before or promptly after seizing their vehicles. The towed cars were parked on private property, generally adjacent to the owners' residences, and neither interfered with any public way nor represented a safety hazard requiring remediation without notice and the opportunity to be heard.  Prior to removing the vehicles, Code Enforcement Officer Sean Gibbons unlawfully secured general administrative warrants by submitting misleading applications that omitted key information. To retrieve their cars, Plaintiffs and Class Members had to pay a private towing company for both the towing and

storage of their vehicles. They also had to pay Calverton Park a monetary fee. As if these costs were not enough, Calverton Park also imposed an unconstitutional special tax bill on Plaintiffs and Class Members, purportedly calculated to reimburse Calverton Park for specific expenditures associated with each towing. In reality, this tax bore no relation to any actual costs incurred by Calverton Park.

2.       The City's unconstitutional conduct upends the already precarious existences of its most vulnerable residents and visitors by denying them dependable access to transportation. Indeed, Calverton Park almost exclusively targeted cars for towing because their owners could not afford the Missouri state sales tax that is a prerequisite to properly registering a vehicle, or because the owners had not yet updated the car's registration due to not being able to afford emissions or safety repairs. This deprivation does not result in a mere inconvenience. Without a reliable means of travel, impacted individuals could not report to work, bring their children to school or medical appointments, and carry out other necessary tasks such as food shopping. By making it harder for individuals to go to work, the towing also makes it even more difficult (if not impossible) for the car owners to pay the Missouri state sales tax or registration renewal that occasioned the tow to begin with. Calverton Park's imposition of a punitive tax bill exacerbated the harm caused by the original towing.

## **Nature of the Action**

3.       It is and has been the policy, custom and practice of the City of Calverton Park to direct the towing of its residents' vehicles from private property for alleged violations of its nuisance ordinances without providing notice or an adequate opportunity for owners to be heard before or promptly after the deprivation of their property.

4.      It is and has been the policy, custom and practice of the City of Calverton Park to order the removal of cars from private property pursuant to insufficiently particular administrative warrants.

5.      It has been the custom and practice of Calverton Park Code Enforcement Officer Sean Gibbons to recklessly or intentionally omit material information from warrant applications resulting in unreasonable seizures of Plaintiffs' and Sub-Class Members' vehicles.

6.      It is and has been the policy, custom and practice of the City of Calverton Park to levy excessive fines in the guise of special tax bills, ostensibly to recover costs associated with each particular tow, but that in reality bear no relation to any expenses incurred by the City.

7.      It is and has been the policy, custom and practice of the City of Calverton Park to impose truly irrational special tax bills that bear no relation to actual expenses incurred by the City in the abatement of each alleged nuisance.

8.      Plaintiffs seek declaratory and compensatory relief.

## Jurisdiction and Venue

9.      This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. § 2201, et seq., and the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. This Court therefore has jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1343.

10.     Venue in this District is proper pursuant to 28 U.S.C. § 1391 because the Defendants reside here, and the events giving rise to Plaintiffs' claims occurred in this District.

## Parties

11.     Plaintiff Christina Reise is a 38-year-old woman. She is a resident of St. Louis County.

12.     Plaintiff Alan Miller is a 58-year-old man. He is a resident of St. Louis County.

13.      Plaintiff Sharon Jones is a 58-year-old woman. She is a resident of St. Louis County.

14.      Defendant City of Calverton Park is a municipal corporation organized under the laws of the State of Missouri and was at all times relevant acting under the color of law. The Defendant operates the Calverton Park Code Enforcement Division, the Police Department, the City Clerk's Office, and all other governmental services in the municipality.

15.      Defendant Sean Gibbons, sued in his individual capacity, is a Code Enforcement Officer for Calverton Park.  At all times relevant to the complaint, Defendant Gibbons was acting under the color of law. He is responsible for directing the Code Enforcement Division and enforcing Calverton Park's municipal nuisance ordinances.

**Factual Overview**

**Unconstitutional Tows of Plaintiff Christina Reise's Vehicles**

16.      In March 2020, Christina Reise moved in with a friend to a single-family dwelling located in the City of Calverton Park.

17.      Reise occupied the property as a tenant along with her son M.T., a minor, age 5 at the time.

18.      Around this time, Reise's name was added to the dwelling's occupancy permit.

19.      Manna Partners, LLC (hereinafter "Manna Partners") owns the property.

20.      In April 2021, Reise's friend moved out and Reise signed a lease with Manna Partners for the house.

21.      In April 2021, Reise's son T.R., a minor, age 15, also moved in. In 2021, Reise owned a Town and Country van which she parked in a private driveway located on

22.      The van was unregistered because Reise lacked funds to pay the vehicle's sales tax.

23.     On July 7, 2021, at the direction of the City, A2B Towing & Recovery (hereinafter "A2B Towing") towed Reise's van from the private driveway of the home.

24.     Reise did not witness the July 7, 2021 towing.

25.     Reise received no correspondence, order to show cause, or any other form of notice prior to the towing of her van on July 7, 2021.

26.     On July 7, 2021, after noticing that her car was missing, Reise found an administrative search warrant from Calverton Park attached to her front door.

27.     The administrative warrant lists the property's owner, Manna Partners LLC, as its target, but makes no mention of Reise.

28.     The administrative warrant consists almost entirely of boilerplate language and contains no identifying information regarding Reise's van.

29.     The warrant, in part, states: "NOW, THEREFORE, these are to command you that you inspect said premises above described within ten (10) days of the issuance of this warrant by day, and take with you, if need be, the power of your City and if said above-described property or any part thereof be found in violation of said section 215.001, subsection 28 of the Revised Ordinances of The City of Calverton Park, that you enforce said Code by bringing the property into compliance and removing the unlicensed and/or inoperable derelict vehicle(s) from the property, and that you thereafter return the record of such violations and enforcement to this Court to be hereafter dealt with in accordance with law."

30.     The City of Calverton Park's Ordinances contain no "Section 215.001."

31.     The Revised Ordinances of the City of Calverton Park contain a "Section 215.010, subsection 28 Nuisances Prohibited Conditions And Acts Which Constitute A Nuisance."

32.     In relevant part, that section provides the following definition of a vehicular nuisance: "The following conditions, acts and business operations are hereby declared to be nuisances affecting public health:

> (28)  Any partly dismantled, wrecked, dilapidated, abandoned or non-operative automobile or other motor vehicle or parts thereof which are found upon any private property, and which are not housed in a garage, basement or other enclosed building. Any motor vehicle, automobile or other elements thereof found disassembled upon private property shall be considered to be dismantled, abandoned, wrecked or dilapidated for the purpose of this Chapter when such automobile or other vehicle is found lacking essential component parts which prevent it from being immediately operative under its own power or which has a deflated tire or tires, or which vehicle or automobile is not properly licensed and registered with a current license plate displayed on the vehicle and with a proper current vehicle registration in possession of the person in charge of the property upon which the vehicle or automobile is located.

City of Calverton Park Code of Ordinances, Section 215.010 (B)(28).

33.     Reise's van was not "partly dismantled, wrecked, dilapidated, abandoned or non-operative" and was not "disassembled upon private property" and did not constitute a nuisance under the relevant provision of the City Code.

34.     Calverton Park's Code requires that before any action is taken with respect to a nuisance, the Code Enforcement Officer must give "written notice to the person or persons causing or maintaining such nuisance" and "order the person or persons to abate the same within a reasonable time to be specified in such notice, which shall not be less than ten (10) days unless the condition constitutes an emergency."  City of Calverton Park Code, Section 215.040. The Code requires that the notice "shall describe each condition of the lot or land declared to be a public nuisance and shall identify what action will remedy the public nuisance." *Id.* It further requires that if the City plans to take action to abate the nuisance, then the notice "shall order such person to appear before the Health Commissioner, or his or her designee, at such time and place as the Code Official may direct, to show cause, if any, why the nuisance should not be abated." *Id.*

35.     Section 215.080 of the City of Calverton Park's Code further provides that additional notice be given to a person after a hearing officer determines that a nuisance exists and must be abated but before the City acts to remediate a nuisance itself: "The hearing shall be conducted by the Health Commissioner or his or her designee. If after hearing all the evidence, it is determined that a nuisance exists, the Health Commissioner shall order the person to abate the nuisance within twenty (20) days or within such other time as the Commissioner may deem reasonable. Such order shall be served in the manner provided in this Section for service of the notice of violation."

36.     Pursuant to City of Calverton Park Ordinances Section 215.080(d), Calverton Park may only act to abate a nuisance after this post-hearing notice has been given and the stipulated period has expired.

37.     As of July 7, 2021, Calverton Park had not provided written notice ordering Reise to attend any hearing regarding her car prior to the towing.

38.     As of July 7, 2021, Calverton Park had not conducted any adequate nuisance hearing regarding Reise's van prior to the towing.  Indeed, Reise had not received notice of any hearing regarding her van.

39.     As of July 7, 2021, Calverton Park had not provided Reise with notice that at an adequate nuisance hearing the Health Commissioner had declared her van to be a nuisance.

40.     As of July 7, 2021, Reise had received no post-hearing notice with instructions to abate a nuisance within a stipulated post-hearing period.

41.     The administrative warrant, therefore, authorized the seizure of Reise's car in violation of the City Ordinances.

42.     Calverton Park afforded Reise no opportunity to be heard before seizing her van on July 7, 2021.

43.     After learning that her car had been towed, Reise called and spoke with Code Enforcement Officer, Defendant Sean Gibbons.

44.     During this conversation, Defendant Gibbons falsely claimed that he had previously provided Reise with a letter informing her that the van was a nuisance.

45.     But again, Reise never received any letter from Calverton Park nor Officer Gibbons regarding the van, any allegations the van constituted a nuisance, or with information about a hearing.

46.     Gibbons also informed Reise that Calverton Park had directed A2B Towing to seize and retain her van.

47.     Reise could not afford a lump sum payment to A2B to secure her car's return.

48.     Eventually, Reise was able to enter a payment plan with A2B Towing to secure the release of her vehicle.

49.     In total, Reise paid A2B Towing $800.00 for the towing and storage of the van.

50.     Reise was also required to pay a vehicle release fee of $25.00 to the City prior to obtaining the van.

51.     Calverton Park also issued a special tax bill to Reise's landlord, Manna Partners, for $225.00.

52.     This special tax bill was purportedly to reimburse Calverton Park for expenses incurred in removing the van from Reise's driveway despite Reise having to separately pay A2B Towing $800.00 for the towing and storage of the van.

53.     Manna Partners passed this bill on to Reise by adding $225.00 to her subsequent rent bill.

54.     Reise could not retake possession of her car until July 15, 2021, seven days later.

55.     At this time, Reise was working as a housecleaner.

56.     Lacking any transportation, Reise was compelled to cancel two cleaning appointments, each of which would have earned Reise $350.00.

57.     Without her van, Reise could not bring her son to a scheduled dental appointment or purchase groceries for her family.

58.     The temporary loss of her vehicle in July 2021, and the ensuing difficulties she faced in caring for her family, caused Reise significant emotional distress.

59.     In April 2022, Reise was hired as a temporary office worker by Iron Mountain.

60.     In this capacity, Reise was assigned to work, as an imaging specialist, at the National Archives located at 1 Archives Drive, St. Louis, Missouri 63138.

61.     This location is approximately 6-7 miles from Reise's home by interstate.

62.     Reise enjoyed working as an imaging specialist and excelled as an employee.

63.     At one point, during her tenure, Reise was informed that she was the most productive imaging specialist at the Archives.

64.     Reise describes the imaging specialist position as "the best job" she has ever had.

65.     In February 2023, Reise purchased a pre-owned 2021 Volkswagen Jetta.

66.     At the time of purchase, the car had passed all necessary inspections including emissions.

67.     The temporary tags issued to Ms. Reise at the time of purchase expired on March 14, 2023.

68.     As of March 14, 2023, Reise lacked the funds needed to pay the Missouri state sales tax and to register the car.

69.     Besides its lack of permanent tags, the car was in pristine condition and painstakingly maintained by Reise.

70.     On March 22, 2023, a letter from Calverton Park regarding a "Derelict, Unlicensed and/or Inoperable Vehicle" arrived in Reise's mailbox.

71.     The letter was not addressed to Reise but to her landlord, Manna Properties.

72.     The letter, signed by Sean Gibbons, stated that a derelict vehicle had been found on the property during an inspection by the City's code enforcement officer, and that the presence of such a vehicle "anywhere on the property" violated section 215.001, subsection 28 of the Revised Ordinances of the City of Calverton Park.

73.     Again, the City's Ordinances contain no "Section 215.001, although the City's Ordinances do contain a "Section 215.010 Nuisances Prohibited Conditions And Acts Which Constitute A Nuisance."

74.     The letter advised that the City would hold an "informational hearing" regarding the "derelict, or unlicensed vehicle on your property" on April 4, 2023, which the owner could attend via telephone.

75.     In bold, uppercase, partially italicized typeface, the letter then stated: "**THIS HEARING IS FOR YOUR INFORMATION ONLY AND *IS* NOT MANDITORY [sic]**."

76.     Following this bolded language, the letter stated: "At this hearing, unless adequate evidence to the contrary is presented, that a derelict or unlicensed vehicle on your property witnessed on 3/15/2023 may be declared a nuisance and an order for the same to be removed may

be issued." This language does not make it clear that the car owner (to whom the letter is not addressed) would need to or even be permitted to present evidence.

77.    This letter also indicates that Reise's vehicle "may be declared a nuisance" at the future telephonic informational hearing but did not provide notice that it had already been officially deemed a nuisance.

78.    The letter provides the recipient with the general number to City Hall rather than a specific number to call for the informational hearing.

79.    This letter failed to comply with the Calverton Park Ordinances Section 215.040 given that it did not order Ms. Reise to appear and show cause – indeed the letter was not addressed to her

80.    Further, upon information and belief, the City often does not actually hold these telephonic "informational" hearings prior to seizing vehicles.

81.    After reading the letter, Reise understood the telephonic informational hearing to be purely informational and did not believe she would be permitted to present any evidence or argument at the proceedings.

82.    Indeed, the letter's language is so confusing that it is hard to imagine any reasonable person concluding that the April 4, 2023 telephonic informational hearing represented an opportunity for the car's owner to be heard to prevent the designation of their car as a nuisance.

83.    Instead, the letter's emphasis on the informational, non-obligatory nature of the telephonic informational hearing appears tailored to dissuade a car's owner from attending.

84.    Had Reise understood that the April 4 telephonic informational hearing represented her opportunity to prevent her car from being towed, she would have strenuously opposed the seizure of her vehicle.

85.     At a hearing regarding her car, Reise would have explained that, despite having expired temporary plates, her car could not fairly be characterized as a nuisance in need of remediation because it was in pristine condition, operable, not a home to vermin or other animals, regularly driven, and not otherwise a safety hazard or aesthetic blight.  Indeed, Reise could have demonstrated that her car did not fit under the City of Calverton Park ordinance definition of a nuisance because it was not a "partly dismantled, wrecked, dilapidated, abandoned or non-operative" automobile. City of Calverton Park Code of Ordinances, Section 215.010(B)(28).

86.     Reise would have also contended that the City should not seize the car as a nuisance because it had passed a safety inspection and emissions test only two months before in February 2023.

87.     The safety inspection and emissions test are prerequisites to vehicle registration; Reise's car was only unregistered due to her lack of funds, a factor that has no bearing on the public's health, safety, or welfare.

88.     At such a hearing, Reise would have also stated that she was currently saving to pay the sales tax needed for permanent plates, that seizing her vehicle would frustrate her efforts by interfering with her ability to reliably commute to her job, and that she would agree to properly register the car if given adequate time by Calverton Park.

89.     Pursuant to the Calverton Park's Code, such arguments would be proper in the forum of a nuisance hearing.

90.     Calverton Park's Ordinances sets forth the following procedure for a nuisance hearing: "The hearing shall be conducted by the Health Commissioner or his or her designee. If after hearing all the evidence, it is determined that a nuisance exists, the Health Commissioner shall order the person to abate the nuisance within twenty (20) days or within such other time as

the Commissioner may deem reasonable. Such order shall be served in the manner provided in this Section for service of the notice of violation. The order may further provide that the appropriate City Official be directed to abate the nuisance if the order is not obeyed within the time period established, and that a special tax bill be issued for the costs of abating the nuisance." City of Calverton Park Revised Ordinances Section 215.08(3)(b).

91.    While the Ordinances grant the Health Commissioner broad authority to set the timeframe within which a person may personally abate a nuisance to any governmental intervention, the ordinances do stipulate there should be some time for abatement *after* there has been an official finding that a nuisance exists.  City of Calverton Park Revised Ordinances 215.080(3)(b).

92.    The Ordinances permit but do not obligate the Health Commissioner to direct the City to remediate a nuisance if a citizen does not successfully abate it within the allotted timeframe: "The order may further provide that the appropriate City Official be directed to abate the nuisance if the order is not obeyed within the time period established, and that a special tax bill be issued for the costs of abating the nuisance."  City of Calverton Park Revised Ordinances Section 215.080(3)(b).

93.    Reise received no information that this purported April 4 telephonic informational hearing took place, given that Reise never received any notice informing her of its outcome.  On information and belief, and in view of the absence of any documentation, no telephonic informational hearing on Reise's vehicle was ever held prior to the towing of her car.

94.    Specifically, Reise never received a determination that following the hearing, the Health Commissioner had determined that her car constituted a nuisance, nor that the Health

Commissioner had issued an order directing the City to abate the vehicle within a certain number of days if Reise did not do so herself.

95.     Indeed, Reise never received an order directing her to abate the nuisance within a certain number of days.

96.     Reise never received notice that to abate the so-called nuisance, the City would tow her car and issue a special tax bill.

97.     The Ordinances also permit the owner to appeal adverse nuisance hearing determinations to the Mayor: "The decision of the Health Commissioner may be appealed by filing an appeal, on such forms as prescribed by the City, with the Mayor within seven (7) days from the Commissioner's decision. The appeal form shall set forth, at a minimum, the detailed grounds for such appeal and such further information as requested on the appeal form. The Mayor shall review the decision of the Health Commissioner either within the Mayor's sole discretion upon the record previously made or upon a new hearing and shall issue a written decision to all parties; such decision may be subject to judicial review in the Circuit Court of St. Louis County by filing an appropriate Petition for Judicial Review within fifteen (15) days of the Mayor's decision." City of Calverton Park Revised Ordinances 215.080(3)(c).

98.     After this purported April 4 telephonic informational hearing, because Reise never received a written decision from the Health Commissioner, Reise was not able to file an appeal pursuant to 215.080(c).  Because she never had the opportunity to receive a decision on her appeal from the Mayor, she was unable to file a Petition for Judicial Review.

99.     On May 23, 2023, at the direction of the City, A2B Towing towed Reise's car from the private driveway of her home.

100.    City Code Enforcement Officer Sean Gibbons was present at the towing on May 23, 2023, and handed Reise an administrative search warrant.

101.    Calverton Park Police Chief Scott Amos was also present at the seizure.

102.    On May 23, 2023, no representative of Calverton Park, including Gibbons and Amos, informed Reise of any post-deprivation opportunity for her to challenge the car's seizure.

103.    At the time of the seizure, Reise told Gibbons that she needed the car to get to work and care for her family.

104.    Gibbons told Reise there was nothing she could do to prevent the City from seizing the car.

105.    The administrative search warrant was the only document that Reise received from the City on May 23, 2023.

106.    The administrative search warrant contained no information regarding a post-deprivation opportunity for Reise to challenge her car's seizure.

107.    The administrative warrant lists the property's owner, Manna Partners LLC, as its target, but makes no mention of Reise.

108.    The administrative warrant consists almost entirely of boilerplate language, contains no identifying information regarding Reise's car and, beyond a change in date, is substantively identical to the July 2021 warrant.

109.    The warrant orders the City to enforce Section "215.001, [sic] subsection 28 of the Revised Ordinances of the City of Calverton Park" by removing unlicensed or inoperable vehicle(s) from her address.

110.    Again, the City's Ordinances contain no Section 215.001, although the City's Ordinances do contain a "Section 215.010 Nuisances Prohibited Conditions And Acts Which Constitute A Nuisance."

111.    As of May 23, 2023, Reise's vehicle was not "partly dismantled, wrecked, dilapidated, abandoned or non-operative," was not disassembled, was fully operative and well-maintained and thus does not qualify as a nuisance under the Calverton Park Cide Code.

112.    As of May 23, 2023, no correspondence from Calverton Park had ordered Reise to attend any hearing regarding her car.

113.    As of May 23, 2023, Reise had received no post-hearing notice that her car had been deemed a nuisance or instructions to abate a nuisance within a stipulated post-hearing period.

114.    As of May 23, 2023, because of the lack of notice of the purported hearing's outcome, Reise had been unable to appeal its finding to the Mayor pursuant to City of Calverton Park Revised Ordinances 215.08(3)(c).

115.    The administrative warrant, therefore, authorized the seizure of Reise's car in violation of the City Ordinances.

116.    The administrative warrant was issued upon the application of Code Enforcement Officer Sean Gibbons.

117.    The warrant application, completed by Gibbons, omitted material information that would have demonstrated the administrative warrant was unreasonable, because Reise's car did not qualify as a nuisance under the relevant definition in the ordinance, Reise was never ordered to attend any nuisance hearing, no adequate nuisance hearing was conducted regarding Reise's car, Reise was never notified of the outcome of any nuisance hearing, and Reise was never given time to abate the nuisance.

118.    On May 25, 2023, Reise received a Special Tax bill for $336.54 addressed to her landlord.

119.    This bill was supposedly calculated to reimburse the City for costs associated with towing her car.

120.    On May 31, 2023, Reise received a Form 4577 in the mail from A2B Towing.

121.    Among other things, this form notified Reise of the following: "To contest the towing or removal you must within ten days of receipt of this notice file a petition in the associate court of the county where the abandoned property is stored to determine if the abandoned property was wrongfully taken or withheld."

122.    Upon information and belief, filing a petition in associate court would not result in a prompt hearing regarding the legality of the tow.

123.    There was also no allegation from any party that Reise had abandoned her car for purposes of bringing a legal action to contest the legality of the tow.

124.    Reise was deprived of her car for 26 days.

125.    Reise finally retrieved her car on June 19, 2023.

126.    During this period, Reise was only able to report to work when a friend was available to drive her.

127.    In total, Reise missed approximately two weeks of work while her car was seized.

128.    As a result of missed work, Reise received a warning in June 2023 from her employer.

129.    Reise was paid on an hourly basis for her work at the National Archives.

130.    The work Reise missed due to her lack of transportation resulted in severe economic hardship for her family.

131.    On several occasions in June 2023, Reise and her kids had little to no food for dinner because she was unable to afford any groceries.

132.    Reise was also unable to attend the high school graduation ceremony of her eldest son in June 2023 because she lacked a means of transportation.

133.    Prestige Financial, the finance company holding a lien on Reise' car, paid, on behalf of Reise, in excess of $3,500.00 to secure her car's release.

134.    The finance company also paid a $25.00 fee to Calverton Park to secure the release of Reise's car.

135.    These payments have been added to the remaining principal of Reise's car loan.

136.    As a result of lost income due to work absences, Reise was unable to pay her rent.

137.    On June 22, 2023, Reise's landlord commenced eviction proceedings for unpaid rent.

138.    After extensive and emotionally taxing legal proceedings, Reise was able to remain in her home pursuant to a settlement agreement with the landlord.

139.    In July 2023, Iron Mountain terminated Reise due to an excessive number of absences.

140.    Reise has yet to secure consistent employment since the loss of her job at Iron Mountain.

141.    As a result of the deprivation of her car, Reise suffered and continues to suffer extreme emotional distress.

### Unconstitutional Tows of Plaintiffs Miller and Smith's Vehicles

142.    Sharon Jones lives in Calverton Park in a rented home with her fiancée Alan Miller and her daughter Jessica Smith.

143.    They rent the home from Deborah and Fred Clinton.

144.    Although the property has a garage and the lease contains no restrictions from using the garage, Mr. and Mrs. Clinton have verbally told Ms. Jones, Ms. Smith, and Mr. Miller they are not allowed to store their cars in the garage.

145.    On December 5, 2022, Ms. Jones was delivering her rent to Ms. Clinton. Ms. Clinton told Ms. Jones that she got a letter from Calverton Park saying that all the cars at the address need to have updated registration.

146.    Neither Ms. Jones nor Mr. Miller received a letter from Calverton Park regarding any vehicles and there was no notification placed on the cars themselves regarding possible consequences for not having updated registration.

147.    Mr. Miller owned a 2018 Malibu that he purchased in 2020. The car was clean, operable, and in good condition.

148.    Mr. Miller had plates on the car but needed to renew his registration.  Mr. Miller was financially struggling to pay all of the required taxes before he could get an up-to-date registration, although he had saved about half of what he needed.  Because of this, his license plate displayed an expired tag from the prior year.

149.    A few days later, Ms. Clinton stopped by and told Ms. Jones that she had spoken to Officer Sean Gibbons and that he said he was "not going to do anything right now" about the cars but that they would need to renew their registration soon.  Specifically, Ms. Clinton told Ms. Jones that Officer Gibbons said that they would have to move the cars after New Years if they didn't have the registration renewed. Ms. Clinton specifically said that Officer Gibbons said he would not tow the car during the holidays.  Based on this conversation, Mr. Miller believed he needed to get the correct tags by early January or else they would get a municipal ordinance violation ticket.

150.    Instead, on the day after Christmas, December 26, 2022, Ms. Jones was outside their home when Officer Gibbons arrived with a tow truck from A2B Towing.

151.    Officer Gibbons told Ms. Jones that they were going to tow Mr. Miller's car and Ms. Smith's car.

152.    Ms. Jones objected to him doing so without notice.  Officer Gibbons told her that Calverton Park had sent a letter to the home, and Ms. Jones attempted to explain to Officer Gibbons that they had never received a letter.

153.    Officer Gibbons said that it did not matter whether they got a letter or not, they were going to tow the cars.

154.    Ms. Jones stood in front of the vehicle and attempted to reason with Officer Gibbons because she did not want to move to allow the tow truck to take the other cars which were parked farther up the driveway.

155.    Officer Gibbons told her that if she did not stop arguing with him and move, he would have her arrested.

156.    At that point, A2B Towing (at the direction of Officer Gibbons) towed Mr. Miller's Malibu.

157.    As of December 26, 2022, Mr. Miller's car was not "partly dismantled, wrecked, dilapidated, abandoned or non-operative," nor was it partially disassembled or unable to be operated.  Indeed, his car was well maintained and driven multiple times a week.

158.    At no point prior to the vehicles being towed on December 26, 2022 did Calverton Park notify Mr. Miller that his cars could be declared a nuisance and give him an opportunity to be heard as to whether his car qualified as a nuisance (which it did not).

159.     At such a hearing, Mr. Miller would have explained that despite needing to renew his registration, his car could not fairly be characterized as a nuisance in need of remediation because it was in pristine condition, operable, not a home to vermin or other animals, regularly driven, and not otherwise a safety hazard or aesthetic blight.

160.     Mr. Miller could have also explained that they were saving up to renew his registration and that seizing the vehicle would frustrate those efforts by costing each individual large amounts of money and interfering with Mr. Miller's ability to commute to employment.

161.     At no point prior to the vehicles being towed on December 26, 2022 did Calverton Park notify Mr. Miller that a hearing had been held and that at that hearing the Health Commissioner had declared his car a nuisance.

162.     At no point prior to the vehicles being towed on December 26, 2022 did Calverton Park notify Mr. Miller that after a hearing, the Health Commissioner had ordered him to abate a nuisance within a certain number of days.

163.     Because Mr. Miller was never notified of a hearing regarding his vehicle, nor notified of the outcome of any supposed hearing which took place, he had no opportunity to appeal that hearing decision or to file a petition for judicial review.

164.     Ms. Jones and Mr. Miller went to Calverton Park City Hall the next day to complain and asked to speak to someone in charge of the Police Department about Officer Gibbons' conduct and the towing of their vehicles.

165.     The City Clerk called up Officer Gibbons. When Ms. Jones said that she wanted to speak to a Lieutenant or Commander, Officer Gibbons said "I'm the Lieutenant, I'm the Commander, I'm the Chief."

166.     Mr. Miller talked to Officer Gibbons, who told him that not only did they have to pay to get the cars released, but that "you are going to have to pay the Clintons their money" for an additional fine Calverton Park levied.

167.     Mr. Miller had to pay $50.00 to Calverton Park to get a release letter to present at the tow yard. He then had to pay $450.00 for storage and towing fees to get the car from A2B Towing.

168.     Shortly after that, Ms. Clinton told Ms. Jones that their household had to pay for the fine levied by Calverton Park, which was $225.00 in total.

169.     Ms. Jones paid Ms. Clinton the money in addition to her rent.

170.     Having to pay this fine further increased the financial burden on the family and made it even more difficult for Mr. Miller to save money to get his plates renewed.

171.     For weeks after Mr. Miller got his car out of the towing impound, he had to park his vehicle in a different municipality and travel to his car if he ever wanted to use it, increasing the burden on him to get to work, medical appointments, or even go grocery shopping.

172.     The constant harassment from Calverton Park Code Enforcement has caused Ms. Jones' other children to be afraid to come over and visit their mother, causing rifts in their family life.

173.     As a result of the deprivation of their cars and the threats of arrest and incarceration, Ms. Jones, Mr. Miller, and Ms. Smith continue to suffer emotional distress.

**Widespread Illegal Towing Scheme**

174.     Upon information and belief, since December 2020, the City has directed the towing of more than 81 vehicles from private property after deeming them nuisances pursuant to the municipal ordinance.

175.   Almost all of these vehicles were seized due to lack of proper licensing or expired license plates, and not due to any visible structural defect or safety hazard.

176.   For example, from March 2, 2022 to June 4, 2023, the City seized at least 38 vehicles from private property for alleged nuisance violations.

177.   Lack of proper licensing or plates served as the predicate for 37 of these 38 seizures.

178.   The only exception appears to be a car that was towed because it was covered by a tarp.

179.   Calverton Park employs substantively identical procedures for each tow, including substantively identical nuisance letters and administrative search warrants.

180.   The nuisance letters, prepared and signed by Sean Gibbons, that Calverton Park sends prior to each tow include the following language regarding a telephonic informational hearing "**THIS HEARING IS FOR YOUR INFORMATION ONLY AND *IS* NOT MANDITORY [sic]**."

181.   These letters are addressed to the owners of the property, not the owners of the cars.

182.   It is common for the letters to not be delivered to the home where the car owners reside.

183.   The letter does not provide a specific number for the telephonic informational hearing but instead just provides the general number to City Hall.

184.   Following this telephonic informational hearing—if it even takes place—Calverton Park does not provide notice to the car owner of its decision as to whether their vehicle was found to be a nuisance and does not give them a specific time to abate the nuisance.

185.   Because there is no final decision, the car owner has no ability to appeal the final decision, and no ability to file a judicial petition based on the appeal result.

186.    The administrative warrants used by the City are so lacking in particularized descriptions of the property to be seized that, on more than one occasion, although the underlying warrant application requested authority to seize only one specific car, Calverton Park removed an additional unspecified vehicle pursuant to the same administrative warrant.

### Sean Gibbons' Unconstitutional Warrant Application Practice

187.    Since 2019, Sean Gibbons has held the position of Code Enforcement Officer for the City of Calverton Park.

188.    In this capacity, Gibbons prepared and submitted warrant applications to secure administrative warrants prior to the seizures of Plaintiffs' and Sub-Class Members' vehicles.

189.    The warrant applications are boilerplate, fillable forms in which Gibbons includes identifying information for the vehicle(s) to be seized, a reason for their being deemed a nuisance, and information as to the address where the vehicle is maintained.

190.    In completing each application, Gibbons recklessly or knowingly omits information that would demonstrate that the seizure of the vehicle(s) would violate municipal ordinances.

191.    In each warrant application, Gibbons omits that the vehicles to be seized are not "partly dismantled, wrecked, dilapidated, abandoned or non-operative."

192.    In each warrant application, Gibbons omits that owners have not been ordered to attend any nuisance hearing and present evidence, insofar that even if a letter is sent, it is not sent to the resident of the property, indicates that the telephonic hearing is merely informational and not mandatory, and does not advise the car's owner that this is their opportunity to be heard.

193.    In each warrant application, Gibbons omits that Calverton Park has not conducted any meaningful nuisance hearing regarding the owner's vehicle.

194.    In each warrant application, Gibbons omits that owners have not been notified of the outcome of any nuisance hearing or that their vehicle has been declared a nuisance, and omits that car owners have not been informed of any post-hearing period in which they may remediate the nuisance themselves prior to the City's ordering the seizure of their vehicle(s).

195.    Upon information and belief, as Code Enforcement Officer, Gibbons is familiar with Calverton Park's municipal nuisance ordinances.

196.    Both Mayor Paunovich and Police Chief Amos have actual knowledge of this unlawful practice or, alternatively, are deliberately indifferent to its existence.

### Special Tax Bills

197.    Each time it abates a nuisance, including towing a vehicle, Calverton Park issues the parcel owner a special tax bill, purportedly calculated to reimburse it for costs associated with each remediation.

198.     Upon information and belief, though these bills are sometimes addressed to the owner of the property from which a vehicle is towed—rather than the vehicle's owner—the vehicle's owner is responsible for payment.

199.    In the case of cars deemed nuisances then seized, this bill supposedly compensates Calverton Park for costs incurred in the removal of the vehicle.

200.    These bills are significant, especially because owners targeted with towing are often unable to afford the cost of properly registering their vehicles.

201.    For example, Calverton Park billed Reise $225.00 the first time for the July 2021 tow and $336.54 for the May 2023 tow.

202.    Vehicle owners must already and additionally pay a private tow company for the towing and storage of their cars and pay Calverton Park a separate $25.00 fee before retrieving their property.

203.    It is, therefore, not credible that Calverton Park spends significant additional funds in carrying out each tow.

204.    The City supposedly calculates each special tax by billing out the time expended by Calverton Park employees on the abatement of each nuisance.

205.    However, in calculating each special tax bill, Calverton Park dramatically inflates the time spent by city employees on any number of uncomplicated, standard tasks.

206.    For example, in an itemized bill recently received by a Calverton Park resident for abating the alleged nuisance of an overgrown lawn pursuant to Section 215 of Calverton Park's ordinances, the City claimed that an employee spent an hour notarizing a document, a facially absurd assertion.

207.    Lacking any remedial purpose or connection to actual municipal expenditures, special tax bills issued after tows are properly characterized as fines.

208.    These fines are grossly disproportional to the conduct of maintaining a car on private property without proper registration or plates.

209.    Indeed, the special tax bills exceed the fines that Calverton Park exacts for the same conduct in its municipal court, given that the municipal ordinance violation fine for improper registration is $82.00.

### Official Policymakers' Knowledge of Unlawful Towing Practices

210.    Calverton Park's mayor, James A. Paunovich, is an official policymaker for the City in that he is responsible for overseeing and managing Calverton Park's budget as well as all

other executive functions of the City's government including law enforcement, nuisance abatement, public health and safety, and revenue collection.

211.    Mayor Paunovich directly oversees the Calverton Park Police Department, the Calverton Park Code Enforcement Division, and the City Clerk's Office.

212.    Mayor Paunovich has actual knowledge of the unconstitutional practices through his managerial role in the municipal government, his supervision of and interactions with Police Chief Amos and Code Enforcement Officer Sean Gibbons, his exposure to various media reports, and his specific duty to review appeals of nuisance hearing determinations.

213.    Upon information and belief, Mayor Paunovich has actual knowledge that the special tax bills are excessive and wholly unrelated to any actual City expenditures through his oversight of the City's revenue collection practices.

214.    Mayor Paunovich has publicly acknowledged the existence of the City's towing scheme on a number of occasions, indicating his actual knowledge of the unlawful practice.

215.    When interviewed for an August 2, 2023 St. Louis Post-Dispatch article, Mayor Paunovich also indicated that he has detailed knowledge of the unlawful towing scheme: "The city obtains warrants before towing vehicles, the mayor said. Then, it charges the vehicle owners for the costs and labor related to the abatement through a bill, which can become a lien if unpaid."[1]

216.    Mayor Paunovich has taken no steps to end the unconstitutional practices and has tacitly, and even explicitly, sanctioned them.

---

[1] Victor Stefanescu, <u>A north St. Louis County municipality fines like no other. Some residents say 'leave me alone.'</u>, ST. LOUIS POST-DISPATCH (Aug. 2, 2023), https://www.stltoday.com/news/local/government-politics/a-north-st-louis-county-municipality-fines-like-no-other-some-residents-say-leave-me/article_4c3c5dec-2b2b-11ee-968a-833cc1691d7d.html.

217. When speaking with the media, Mayor Paunovich addressed residents who objected to the City's practices "It has everything to do with following the law. If you don't like to follow the law, then go somewhere else."[2]

218. Calverton Park Police Chief Scott Amos is also an official policymaker with actual knowledge of illegal towing practices through his presence at tows and his managerial role in the Calverton Park Police Department.

219. Because he regularly attends the tows, for instance, Chief Amos has actual notice of the content of the unlawful administrative warrants utilized to affect the seizures.

220. Amos has made no effort to end the unconstitutional practices and has tacitly sanctioned them through his inaction.

221. Sean Gibbons is also an official policymaker in that he directs all code enforcement operations in Calverton Park; indeed, on the Calverton Park municipal website, Sean Gibbons is the only official listed on the page describing the Code Enforcement Division.

222. As head of the Code Enforcement Division, Officer Gibbons oversees the enforcement of the City's municipal nuisance ordinances, directly managing the entire towing process from the time a nuisance letter is generated and transmitted to the seizure of a vehicle.

223. Given his active role in the Towing Scheme, Officer Gibbons has actual knowledge of the unconstitutional practices which he has actively furthered.

## CLASS ALLEGATIONS

224. The named Plaintiffs bring this action on their own behalf and, pursuant to Fed. R. Civ. P. 23(b)(1) and/or (b)(3), as a class action on behalf of a class of persons defined as:

---

[2] *Id.*

**Proposed Class**: All persons whose cars were seized from private property, from September 25, 2018 to present, at the direction of Calverton Park due to an alleged violation of municipal nuisance ordinances.

**Proposed Sub-Class**: All persons whose cars were seized from private property, from on or about November 1, 2019 until present, for alleged violations of municipal nuisance ordinances pursuant to administrative warrants issued upon the applications of Calverton Park Code Enforcement Officer Sean Gibbons.

225.    Under Fed. R. Civ. P. 23(a), certification of a class is appropriate where: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

226.    This action is brought and may properly be maintained as a class action pursuant to 23(b)(1) and/or (b)(3), of the Federal Rules of Civil Procedure. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a).

## RULE 23(a)

**Typicality**

227.    Plaintiffs Ms. Reise, Mr. Miller, and Ms. Jones are typical members of the proposed class and sub-class.

228.    The named Plaintiffs and Class Members each have a tangible and legally protectable interest at stake in this action.

229.    The claims of the named class representatives and the absent class members have a common origin and share a common basis. Their claims originate from the same illegal,

unconstitutional practices of Defendants Calverton Park and Sean Gibbons. Indeed, Plaintiffs and nearly all unnamed class members were deprived of their means of transportation because their vehicles were allegedly unlicensed or lacking proper plates.

230.     The proposed class representatives state claims for which relief can be granted that are typical of the absent class members. If brought and prosecuted individually, the claims of each class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories and seek the same relief.

231.     The claims and remedial theories pursued by the named class representatives are sufficiently aligned with the interests of absent class members to ensure that the universal claims of the class will be prosecuted with diligence and care by the Plaintiffs as representatives of the class.

**Numerosity**

232.     The members of the class are so numerous that joinder of all class members is impracticable. Upon information and belief, the class consists of at least one hundred persons, not all of whom resided or continue to reside in Calverton Park. The class is ascertainable because the Defendants have identifying information for each class member including, but not limited to, the unique identifiers of each vehicle seized.

**Commonality**

233.     The questions of law and fact common to the class include, *inter alia*:

   a.   Whether Calverton Park failed to adequately notify Plaintiffs and Class Members of any pre-seizure hearing.

b.  Whether Calverton Park's failure to adequately notify Plaintiffs and Class Members of any pre-seizure hearing resulted in a seizure of their vehicles without any pre-deprivation opportunity to be heard.

c.  Whether Calverton Park failed to conduct meaningful or adequate pre-deprivation hearings.

d.  Whether Calverton Park's failure to conduct meaningful or adequate pre-deprivation hearings resulted in a seizure of Plaintiffs' and Class Members' vehicles without any pre-deprivation opportunity to be heard.

e.  Whether Calverton Park failed to provide Plaintiffs and Class Members with any prompt post-seizure hearing.

f.  Whether the failure to provide Plaintiffs and Class Members with any prompt post-seizure hearing resulted in a seizure of Plaintiffs' and Class Members' vehicles without any prompt post-deprivation opportunity to be heard.

g.  Whether the City failed to provide Plaintiffs and Class Members with notice that their vehicles had been deemed nuisances and would be towed from private property.

h.  Whether Calverton Park deprived Plaintiffs and Class Members of their vehicles without due process.

i.  Whether the City's use of boilerplate administrative warrants lacking any information specifically identifying the vehicle(s) to be towed resulted in unreasonable seizures because the warrants were insufficiently definite to enable the searching officers to identify the property authorized to be seized.

j.   Whether Calverton Park's special tax bills lacked any remedial purpose such that they are properly classified as fines.

k.   Whether Calverton Park's special tax bills were grossly disproportional to the gravity of Plaintiffs' and Class Members' alleged offense of maintaining a vehicle as a nuisance on private property.

l.   Whether Calverton Park's special tax bills were unrelated to any actual city expenditures.

m.   Whether the imposition of special tax bills wholly unrelated to actual municipal expenditures was truly irrational.

**Adequate Representation**

234.   The named Plaintiffs are willing and prepared to serve the Court and proposed class in a representative capacity with all obligations and duties necessary. The Plaintiffs will fairly and adequately protect the interests of the class and have no interests adverse to, or which directly or irrevocably conflict with the interests of the class. The self-interests of the named class representatives are coextensive with and not antagonistic to those of the absent class members. The proposed representatives will undertake to protect the interests of the absent class members.

235.   The named Plaintiffs have engaged the services of attorneys from ArchCity Defenders, a firm with experience litigating complex civil rights matters in federal court.

236.   Said counsel is experienced in complex class litigation, will adequately prosecute this action and will capably represent the named class representatives and absent class members.

**RULE 23(b)(1)**

237.   The prosecution of separate actions by individual members of the class would create a risk of adjudication with respect to individual members of the class that would, as a

practical matter, be dispositive of the interests of other members of the class who are not parties to the action or could substantially impair or impede their ability to protect their interests.

238.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications among individual members of the class that would establish incompatible standards of conduct for the parties opposing the class.

**RULE 23(b)(3)**

239.    The questions of law and fact common to members of the class predominate over any questions affecting only individual members, and can be resolved with common evidence.

240.    A class action is superior to other available methods for the fair and efficient adjudication of the controversies herein in that:

a. Individual claims by the class members are impractical as the costs of pursuit far exceed what any one plaintiff or class member has at stake;

b. There has been no other litigation over the controversies herein and individual members of the class have no interest in prosecuting and controlling separate actions; and

c. The proposed class is manageable.

**CLAIMS FOR RELIEF**

**COUNT I**
**Fourteenth Amendment, 42 U.S.C. § 1983—Deprivation of Property Without Due Process**
**(Christina Reise, Alan Miller, Individually and as Class Representatives against Calverton Park)**

241.    Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs as set forth fully herein.

242.    Plaintiffs bring this Count 1 individually and on behalf of the members of the Class against Defendants pursuant to 42 U.S.C. § 1983 and Fed. R. Civ. P. 23.

243.     Calverton Park and its employees, agents, and representatives were at all times relevant, acting under the color of law.

244.     When a person is deprived of protected property interests, due process requires notice and that a hearing be provided before an impartial decision maker, at a meaningful time, and in a meaningful manner.

245.     Generally, due process requires that a person be afforded an opportunity to be heard prior to the seizure of their property.

246.     Where a pre-deprivation hearing is not possible or otherwise impracticable, due process requires a prompt post-deprivation hearing.

247.     Where the seizure of a vehicle is concerned, courts have found even a delay of more than seven days between the deprivation and the hearing is clearly excessive.

248.     Plaintiffs and class members had protected property interests in their vehicles parked on private property.

249.     Calverton Park deprived them of their protected property interests when it directed the towing of their vehicles.

250.     In violation of the Constitution, Calverton Park offered Plaintiffs and class members no opportunity to be heard before or after taking their vehicles. The only correspondence from Calverton Park is addressed to the owner of the property rather than the residents of the property or owners of the car.  No efforts are taken to put the notice on the car itself.

251.     Moreover, the actual residents or owners of the car often do not receive any correspondence from Calverton Park at all.

252.     Even if car owners receive "Derelict, Unlicensed and/or Inoperable Vehicle" letters, like the one Reise received on March 22, 2023, the City failed to notify Plaintiffs and class

members of any pre-deprivation hearing because, in bolded all-caps print, the letters stated that the "hearings" were for their information only and not mandatory.

253.    The letters, moreover, did not include any indication that Plaintiffs or class members would be permitted to be heard or offer evidence at the informational hearing.

254.    Calverton Park regularly does not even conduct the pre-informational phone call referenced in the letters; nor has the city established any other procedure that would guarantee a meaningful hearing.

255.    Nor does Calverton Park give notice of any purported hearing's outcome, leaving Plaintiffs and Class Members unaware that their vehicles were officially deemed nuisances prior to being towed.

256.    Calverton Park provided no post-seizure hearing to Plaintiffs or Class Members, let alone a prompt post-seizure hearing.

257.    Calverton Park's official policymakers directed the towing of the vehicles without pre or post-deprivation hearings.

258.    Alternatively, Calverton Park's official policymaker knew of and sanctioned these unconstitutional customs.

259.    Calverton Park's official policymakers took no steps to ameliorate this continuing, widespread, and persistent pattern unconstitutional conduct of which they were on notice.

260.    Calverton Park's official policymakers were deliberately indifferent to and tacitly authorized this pervasive custom of unconstitutional conduct.

261.    The policies, practices and customs described herein were the moving force behind and the proximate cause of Plaintiffs and the Class being subjected to violations of their constitutional right to due process.

262.     As a result of the policies, practices and customs described herein, Plaintiffs and the Class suffered actual damages.

263.     If Plaintiffs and the Class succeed in this Count I, they are entitled to an award of attorney fees and costs pursuant to 42 U.S.C. § 1988 *et seq.*

### COUNT II
**Fourth Amendment, Fourteenth Amendment, and 42 U.S.C. § 1983 — Unreasonable Seizure of Property Due to Insufficiently Particular Warrants**
**(Christina Reise, Alan Miller, Individually and as Class Representatives against Calverton Park)**

264.     Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs as set forth fully herein.

265.     As incorporated through the Fourteenth Amendment, the Fourth Amendment guarantees individuals' rights to be free from unreasonable seizures of their property.

266.     The Fourth Amendment requires that warrants particularly describe the things to be seized such that search officers may identify the property authorized to be seized.

267.     Calverton Park seized Plaintiffs' and Class Members' property when it towed their vehicles from private property.

268.     Calverton Park conducted these seizures pursuant to administrative warrants that included no identifying information for the vehicles to be seized.

269.     The administrative warrants are so lacking in particularity that, on more than one occasion, Calverton Park seized more than one vehicle pursuant to a single warrant despite the underlying application having sought authority to seize only a single vehicle.

270.     This practice resulted in the unreasonable seizure of Plaintiffs' and Class Members' vehicles.

271.    Calverton Park's official policymakers directed the issuance of administrative warrants without particularized details.

272.    Calverton Park's official policymakers knew of and sanctioned these unconstitutional customs.

273.    Calverton Park's official policymakers took no steps to ameliorate this continuing, widespread, and persistent pattern of unconstitutional conduct of which they were on notice.

274.    Calverton Park's official policymakers were deliberately indifferent to and tacitly authorized this pervasive custom of unconstitutional conduct.

275.    The policies, practices and customs described herein were the moving force behind and the proximate cause of Plaintiffs and the Class being subjected to violations of their constitutional right to be free from unreasonable seizures.

276.    As a result of the policies, practices and customs described herein, Plaintiffs and the Class suffered actual damages.

277.    If Plaintiffs and the Class succeed in this Count II, they are entitled to an award of attorney fees and costs pursuant to 42 U.S.C. § 1988 *et seq.*

### <u>COUNT III</u>
**Fourteenth Amendment and 42 U.S.C. § 1983—Substantive Due Process Imposition of Truly Irrational Special Tax Bills**
**(Christina Reise, Sharon Jones, Alan Miller, Individually and as Class Representatives against Calverton Park)**

278.    Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs as set forth fully herein.

279.    The Fourteenth Amendment shields persons from truly irrational governmental actions that deprive them of constitutionally protected property interests.

280.    Plaintiffs and Class Members had constitutionally protected property interests in their money.

281.    After seizing their cars, Calverton Park imposed special tax bills on Plaintiffs and Class Members, ostensibly calculated to recoup the specific costs associated with each tow.

282.    Calverton Park issued these bills even though Plaintiffs and Class Members had to directly pay the tow company for the towing and storage of their vehicles as well as a separate $25 fee to Calverton Park prior to retrieving their property.

283.    The amounts of these bills bear no relation to any expenses that the City incurred in conducting the seizures.

284.    To the extent that these bills purportedly reflect time spent by City employees on each tow, the time allocations are so inflated as to be untethered from reality.

285.    The special tax bills, purportedly tailored to reimburse actual costs incurred by the City in each seizure, are truly irrational because they are wholly unconnected to any actual municipal expenditures.

286.    The special tax bills shock the conscience because they are the result of an effort by Calverton Park to extract money out of its residents who are financially struggling, with no benefit to the public or relation to public expenditures.

287.    These special tax bills are oppressive because they target persons who are already struggling to bear the costs associated with registering their vehicles.

288.    Calverton Park imposed these special tax bills pursuant to an official policy.

289.    Calverton Park's official policymakers directed the issuance of these special tax bills.

290.    Alternatively, Calverton Park's official policymakers knew of and sanctioned these unconstitutional practices.

291.    Calverton Park's official policymakers took no steps to ameliorate this continuing, widespread, and persistent pattern of unconstitutional conduct of which they were on notice.

292.    Calverton Park's official policymakers were deliberately indifferent to and tacitly authorized this pervasive custom of unconstitutional conduct.

293.    The policies, practices and customs described herein were the moving force behind and the proximate cause of Plaintiffs and the Class being subjected to violations of their constitutional right to be free from truly irrational government conduct.

294.    As a result of the policies, practices and customs described herein, Plaintiffs and the Class suffered actual damages.

295.    If Plaintiffs and the Class succeed in this Count III, they are entitled to an award of attorney fees and costs pursuant to 42 U.S.C. § 1988 *et seq.*

## <u>COUNT IV</u>
**Eighth Amendment, Fourteenth Amendment and 42 U.S.C. § 1983—Excessive Fines
(Christina Reise, Sharon Jones, Alan Miller, Individually and as Class Representative
against Calverton Park)**

296.    Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs as set forth fully herein.

297.    As incorporated by the Fourteenth Amendment, the Eighth Amendment forbids the imposition of excessive fines.

298.    A fine is money paid to the government for, at least in part, the purpose of punishing conduct.

299.    A fine is excessive when it is grossly disproportional to the conduct at issue.

300.   The title of a fee is not controlling in deciding whether it constitutes a fine for the purposes of the Eighth Amendment; civil sanctions and fees constitute fines if they are not solely remedial in purpose.

301.   The special tax bills that Calverton Park imposed on Plaintiffs and Class Members are not solely remedial in purpose because they are wholly untethered from any municipal costs arising from each tow.

302.   Lacking any true remedial purpose, the special tax bills can only be understood as fines.

303.   These special tax bills are grossly disproportional to the conduct of maintaining a vehicle as a nuisance on private property.

304.   Nearly all vehicles at issue were deemed nuisances because of lack of proper registration or plates.

305.   Parked on private property, these vehicles posed no safety hazard and did not interfere with the public's use of the roads.

306.   Moreover, the special tax bills far exceed the fines that the City requires in its municipal court as punishment for lack of proper registration.

307.   These special tax bills, therefore, represented excessive fines that violated the Eighth Amendment.

308.   Calverton Park imposed these excessive fines pursuant to an official policy.

309.   Calverton Park's official policymakers directed the imposition of these excessive fines.

310.   Alternatively, Calverton Park's official policymakers knew of and sanctioned these unconstitutional customs.

311.    Calverton Park's official policymakers took no steps to ameliorate this continuing, widespread, and persistent pattern of unconstitutional conduct of which they were on notice.

312.    Calverton Park's official policymakers were deliberately indifferent to and tacitly authorized this pervasive custom of unconstitutional conduct.

313.    The policies, practices and customs described herein were the moving force behind and the proximate cause of Plaintiffs and the Class being subjected to violations of their constitutional right to be free from excessive fines.

314.    As a result of the policies, practices and customs described herein, Plaintiffs and the Class suffered actual damages.

315.    If Plaintiffs and the Class succeed in this Count IV, they are entitled to an award of attorney fees and costs pursuant to 42 U.S.C. § 1988 *et seq.*

**COUNT V**
**Fourth Amendment, Fourteenth Amendment and 42 U.S.C. § 1983- Unreasonable Seizure Due to Omission of Material Information From Warrant Applications**
**(Christina Reise, Alan Miller, and Jessica Smith Individually and as Sub-Class Representatives against Sean Gibbons and Calverton Park)**

316.    Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs as set forth fully herein.

317.    As incorporated through the Fourteenth Amendment, the Fourth Amendment guarantees individuals' rights to be free from unreasonable seizures of their property.

318.    Officers, when applying for a warrant, are liable for Fourth Amendment violations when they (1) omit facts with the intent to make, or in reckless disregard of whether they thereby make, the affidavit misleading and (2) the affidavit, if supplemented by the omitted information would not have been sufficient to support a finding of probable cause.

319.    While the issuance of administrative warrants does not require a quantum of probable cause equal to that in criminal cases, administrative warrants are only reasonable where an application sets forth specific evidence of an existing violation or a showing that reasonable legislative or administrative standards for conducting an inspection are satisfied with respect to a particular location.

320.    Calverton Park Code Enforcement Officer Sean Gibbons prepared and signed the applications for administrative search warrants that were used to obtain warrants for the seizure of Plaintiffs and Sub-Class Members' vehicles.

321.    At all relevant times, Gibbons was acting under the color of state law.

322.    In preparing applications for administrative search warrants pursuant to City Ordinance Section 215, Gibbons always omitted the following material information: target vehicles' owners had not been ordered to attend any nuisance hearing as required by Calverton Park Ordinances; Calverton Park  failed to conduct a meaningful  nuisance hearing in each case; Calverton Park failed to notify target vehicle owners of the outcome of any nuisance hearing; Calverton Park failed to notify target vehicle owners of any post-hearing timeframe in which they needed to remediate the nuisance if they did not wish Calverton Park to seize their vehicle.

323.    Pursuant to Section 215 of the Calverton Park Ordinances, each of the foregoing administrative actions is an independent prerequisite to the City's lawfully abating a nuisance.

324.    Had Gibbons included the foregoing material information in the administrative warrant applications, the applications would not have provided specific evidence that Plaintiffs and Class Members' vehicles could be legally seized pursuant to the Calverton Park Ordinances or demonstrated reasonable legislative or administrative standards for conducting seizures were satisfied.

325.    Instead, the material information that Gibbons omitted would have demonstrated that Plaintiffs and Class Members' vehicles could not be lawfully seized under the Calverton Park Ordinances or any other legislative or administrative standards.

326.    Defendant Gibbons, as a Code Enforcement Officer, knew or should have known that Calverton Park's own laws require notice and an opportunity to be heard prior to towing a person's vehicle.

327.    Defendant Gibbons also knew or should have known that his actions would result in the violation of Plaintiffs' and Class Members' constitutional rights.

328.    Defendant Gibbons's conduct described above was done with evil motive or intent, or was done with reckless or callous indifference to the constitutional rights of Plaintiffs and Class Members, such that punitive damages should be awarded to Plaintiffs and Class Members and against Defendant Gibbons, individually, to deter Defendant Gibbons and other similarly situated government officials from engaging in this unconstitutional misconduct in the future.

329.    Calverton Park's official policymakers directed Officer Gibbons to submit applications for administrative warrants without including material information.

330.    Alternatively, Calverton Park's official policymakers knew of and sanctioned these unconstitutional customs.

331.    Calverton Park's official policymakers took no steps to ameliorate this continuing, widespread, and persistent pattern of unconstitutional conduct of which they were on notice.

332.    Calverton Park's official policymakers were deliberately indifferent to and tacitly authorized this pervasive custom of unconstitutional conduct.

333.    The policies, practices and customs described herein were the moving force behind and the proximate cause of Plaintiffs and the Class being subjected to violations of their constitutional right to be free from unreasonable seizures.

334.    As a result of the policies, practices and customs described herein, Plaintiffs and the Class suffered actual damages.

335.    If Plaintiffs and the Class succeed in this Count V, they are entitled to an award of attorney fees and costs pursuant to 42 U.S.C. § 1988 *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, having stated the foregoing allegations and claims, Plaintiffs pray that this Court:

A.  Certify the Classes as requested herein;

B.  Appoint Plaintiffs' counsel as lead counsel for the Classes;

C.  Appoint Plaintiffs Christine Reise, Alan Miller, and Sharon Jones as representatives of the Class and Sub-Class;

D.  Enter a declaratory judgment that declares that Defendant City of Calverton Park's conduct has violated Plaintiffs' and class members' Fourteenth, Fourth, and Eighth Amendment rights.

E.  Enter a declaratory judgment that declares that Defendant Sean Gibbons' conduct has violated Plaintiffs' and class members' Fourth Amendment rights.

F.  Enter a judgment compensating the Plaintiffs and others similarly situated for the damages that they suffered as a result of Defendants' unconstitutional and unlawful conduct;

G.  Impose punitive damages against Sean Gibbons in his individual capacity;

H.  Award pre-judgment and post-judgment interest;

I.   Issue an order and judgment granting reasonable attorneys' fees and costs pursuant

    to 42 U.S.C. § 1988; and

J.   Any other relief this Court deems just and proper.

### DEMAND FOR JURY

Plaintiffs and the proposed Class respectfully demand a jury trial on all issues so triable.

Dated: October 23, 2023          Respectfully submitted,

                             ARCHCITY DEFENDERS, INC.

                             */s/ Maureen Hanlon*
                             Maureen Hanlon (MBE#70990MO)
                             Lee R. Camp, #67072MO
                             Nicholas Wanger (710472MD)
                             440 N. 4th Street, Suite 390
                             Saint Louis, MO 63102
                             855-724-2489
                             314-925-1307 (fax)
                             mhanlon@archcitydefenders.org
                             lcamp@archcitydefenders.org
                             nwanger@archcitydefenders.org